Cydney A. CRUE, et al., Plaintiffs,

v.

Michael AIKEN, Defendant.

No. 01–1144.

United States District Court,
C.D. Illinois.

April 6, 2001.

Harvey Grossman, Jane M. Whicher, Lauren B. Raphael, Adam Schwartz, Barbara O'Toole, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for plaintiffs.

William J. Brinkmann, Michael R. Cornyn, Thomas Mamer & Haughey, Champaign, IL, for defendant.

## ORDER

MIHM, District Judge.

This matter is now before the Court on Plaintiffs' Motion for a Temporary Restraining Order ("TRO") enjoining the University of Illinois (the "University") from requiring the preclearance of communications with prospective student athletes by two proposed classes of putative Plaintiffs. For the reasons set forth below, the Motion for Temporary Restraining Order [# 4] is GRANTED.

### I. JURISDICTION

The jurisdiction of the Court arises pursuant to 28 U.S.C. § 1331, as the matter presents a case or controversy arising under the First Amendment to the U.S. Constitution.

### II. BACKGROUND

Plaintiffs are students and faculty members at the University who publicly oppose the use of the Chief Illiniwek mascot as creating a hostile environment for Native American students, promoting the acceptance of inaccurate information in an educational setting, increasing the difficulty of recruiting Native American students, and contributing to the development of cultural biases and stereotypes. They have in the

past expressed their opposition to Chief Illiniwek through public speaking in various forums, writing letters, meeting with student groups, submitting newspaper articles for publication, and attending protests, and the University has made no attempt to interfere with such efforts. However, Plaintiffs now wish to contact prospective student athletes to make them aware that the University and its athletic program utilize a symbol that is, in their opinion, degrading to the Native American race, provide information on the controversy, and in some cases to ask the prospective students to consider whether or not they wish to participate in a program which is indifferent to racial injustice. How they would learn the identities of those prospective student athletes or precisely what avenue of communication would be used is not part of this record.

On March 2, 2001, Chancellor Aiken sent an email message to all faculty, staff, and students at the University which stated in relevant part:

Questions and concerns have been raised recently about potential contacts by employees, students or others associated with the University with student athletes who are being recruited by the University of Illinois. As a member of the National Collegiate Athletics Association (NCAA) and the Big Ten Athletic Conference, there are a number of rules with which all persons associated with the University must comply. For example, the NCAA regulates the timing, nature and frequency of contacts between any University employee and prospective athletes. It is the responsibility of the coaches and administration in the Division of Intercollegiate Athletics to recruit the best student athletes to participate in varsity sports at the University of Illinois. No contacts are permitted with prospective student athletes, including high school and junior college students, by University students, employees or others associated with the University without express authorization of the Director of Athletics or his designee.

The University faces potentially serious sanctions for violation of NCAA or Big Ten rules. All members of the University community are expected to abide by these rules, and certainly any intentional violations will not be condoned. It is the responsibility of each member of the University to ensure that all students, employees and others associated with the University conduct themselves in a sportsmanlike manner. Questions about the rules should be addressed to Mr. Vince Ille, Assistant Director for Compliance, Bielfeldt Athletic Administration Building, 1700 S. Fourth Street, Champaign, IL 61820, (217) 333–5731, E-mail: ille@uiuc.edu.

(Plaintiffs' TRO Exhibit 1, hereinafter referred to as the "Preclearance Directive.") On the same date, after the receipt of this email, Plaintiff Professor Fred Hoxie ("Professor Hoxie") sent a follow-up email to the Chancellor indicating his desire to inform prospective students about the University's perceived unwillingness to respond to the concerns of Native Americans with respect to the Chief Illiniwek controversy and seeking guidance about how the Preclearance Directive impacted him. (Plaintiffs' TRO Exhibit 2.) Nearly two weeks later, Professor Hoxie received a response from Vince Ille ("Mr.Ille"), Assistant Athletic Director for Compliance, indicating that the NCAA rules, and therefore the Preclearance Directive, apply in four situations:

[I]f the prospective students contacted are identified for contact based upon their participation in athletics, if the contact is made for the purpose of addressing any issue related to athletics, if the contact is made for the purpose of ad-

dressing the prospective student's possible participation in intercollegiate athletics, or if the contact is made at the request of a Division of Intercollegiate Athletics staff member. . . . We are committed as an institution to operating our intercollegiate athletics program in compliance with the rules and regulations of the NCAA. This means that we expect members of the University community to respect NCAA rules, and certainly not to intentionally violate them.

(Plaintiffs' TRO Exhibit 4.) Professor Hoxie replied that he did not intend to discuss the athletic program with prospective student athletes, but still did not understand how he could communicate his concerns regarding the racial atmosphere on campus to them under the Preclearance Directive. On March 20, 2001, Mr. Ille again responded with the list of four situations in which the NCAA rules apply to regulate contact with prospective students. (Plaintiffs' TRO Exhibit 3.)

On March 19, 2001, Chancellor Aiken addressed the faculty senate, reading from a written statement which essentially reiterated the statements contained in Mr. Ille's March 20, 2001, email to Professor Hoxie. (Exhibit A to Professor Kauffman Affidavit.) His statement also included a comment to the effect that he had received emails posing a series of hypothetical questions about the First Amendment and that engaging in a debate about such matters would not seem helpful or productive. The entire text of the Chancellor's statement was as follows:

> The University values and defends the principles of free speech and academic freedom for members of the University community.
>
> The University does not seek to interfere with the expression of views regarding matters of public concern.
>
> However, we also are a member of the NCAA, and are committed to controlling our intercollegiate athletics program in compliance with the rules and regulations of the NCAA.
>
> This means that we expect members of the University community to respect NCAA rules, and certainly not intentionally violate them.
>
> As explained in my e-mail of March 2, there are numerous and detailed NCAA rules regarding contacts by faculty and other University representatives with prospective student-athletes. The NCAA Division I Manual itself is 480 pages long. That is why my e-mail advised that any such contacts should occur only with the express authorization of the Director of Athletics or his designee, who have experience in these issues. This is the same policy that this campus consistently has followed in regulating contacts with prospective student-athletes.
>
> I have sought advice from the DIA compliance officer, Vince Ille, and Legal Counsel on this issue. Mr. Ille also consulted with the NCAA.
>
> We expect members of the University community to express their viewpoints without violating NCAA rules concerning contacts with prospective student-athletes. Numerous such opportunities abound, including letters to the editor, press releases, radio/TV interviews leafleting, and public speeches. Various faculty members and others have availed themselves of these opportunities over the years.
>
> Let me address one other point: we have received some e-mails in response to my March 2 e-mail that pose a series of hypothetical questions about the First Amendment and other issues. Engaging in a debate at this time about such matters hardly seems helpful or productive.

On April 4, 2001, the Court held a hearing on Plaintiffs' Motion for Temporary Restraining Order, during which both sides presented evidence and argument on the issue. The matter was taken under consideration, and this Order follows.

## III. POSITIONS OF THE PARTIES

Plaintiffs bring this suit, alleging that their constitutionally protected rights to free speech have been violated by the overbroad and unfettered prior restraint of speech contained in the Preclearance Directive. Specifically, the Plaintiffs contend that the Preclearance Directive unlawfully allows the Director of Athletics absolute control over all communications between the University community and prospective student athletes and unconstitutionally deprives members of the University community of the ability to convey their message anonymously. They seek injunctive relief prohibiting Chancellor Aiken from requiring the preclearance of communications with prospective student athletes by two proposed classes: (1) by University students who do not represent the athletic interests of the University and who do not intend and will not recruit prospective student athletes; and (2) on matters of public concern by University faculty who do not represent the athletic interests of the University and who do not intend and will not recruit prospective student athletes.

The University contends that although the Preclearance Directive may impose certain restrictions on Free Speech, these restrictions are reasonable and necessary to advance three important interests. First, the University contends that as a member of NCAA, it has a duty to adhere to that organization's rules and regulations and that potential contacts by the Plaintiffs in this case would violate such rules and regulations. Second, the University contends the Preclearance Directive is necessary in order to adhere to its obligation of preventing the harassment of potential student athletes as espoused in the NCAA Bylaws and also pursuant to its own independent duty. Finally, the University asserts that the Preclearance Directive is necessary in order to maintain and control the management of the school's athletic department and recruiting. Accordingly, the University contends that these interests tilt the scales of any balancing test in favor of a finding that the Preclearance Directive is constitutional.

## IV. SUMMARY OF COURT'S RULING

The Plaintiffs in this case purportedly intend to convey various messages directed toward potential student athletes that range from informing these students of the Chief Illiniwek controversy to inquiries that might conceivably have the effect of discouraging that student from attending the University. It is not the function of this Court to determine whether it would be an exercise of good judgment to engage in such speech; nor does the Court express any opinion on the Chief Illiniwek controversy itself; rather, the Court's duty is to resolve the legal dispute between the parties now before it.

This Court also recognizes that the ruling it makes today does not resolve every potential occurrence of problem conduct that may, might, or could conceivably arise in the future. The issue before this Court is whether the University can create a checkpoint through which a student or faculty member who does not represent the University's Athletic Department must seek and obtain pre-approval from the Athletic Director or his designee before engaging in communications with prospective student athletes on issues which do not constitute athletic recruitment under the definitions contained within the NCAA Bylaws. This issue pits the University's duties and obligations under the NCAA

rules and regulations against its independent duty to protect or at least not violate the University community's constitutional right of free speech. It is in regard to this latter duty that the Court finds the University has fallen short.

In granting the Plaintiffs' request for a Temporary Restraining Order, this Court finds that both putative classes of Plaintiffs have shown a substantial likelihood of success on the merits of the underlying litigation, that there is an absence of an adequate remedy at law, and that they will suffer irreparable harm if the injunction is not granted. The Court also finds that the balance of harm weighs heavily in favor of the Plaintiffs if the injunction should not issue and that the public interest weighs in favor of granting the relief requested by Plaintiffs.

The Preclearance Directive is an unlawful prior restraint that results in a chilling of the putative student class' constitutionally protected speech that cannot be justified by the interests advanced by the University. With respect to the second putative class, although an employer may impose certain restraints on job-related speech that would not be constitutional if imposed on the public at large, the Court finds that the speech of the purported faculty class is also unconstitutionally burdened by the Preclearance Directive. It is undisputed by the University that the Chief Illiniwek controversy presents a matter of public concern, and the Court concludes that the University's stated interests are not sufficient to outweigh the free speech interests of these Plaintiffs. In conducting this inquiry, the Court further finds that the Preclearance Directive is unconstitutionally overbroad in that it unnecessarily reaches a substantial amount of constitutionally protected conduct, impermissibly vests the Director of Athletics or his designee with largely unconstrained discretion to decide who can and cannot speak to prospective student athletes, and unnecessarily chills or even eliminates the possibility for anonymous speech, all of which weigh in favor of Plaintiffs and the issuance of a temporary restraining order.

Chancellor Aiken and Mr. Ille spent several hours on the witness stand during the TRO hearing testifying about a number of matters relevant to this case. The Court thanks them for their patience and candor during that intense process. Nothing in this Order is intended to suggest that either Chancellor Aiken or Mr. Ille has at any time acted other than in good faith and in pursuit of their duties to the University as they saw them at the time. What this Order finds is that they were mistaken as to where their primary duty lay. That's why we have lawsuits.

After listening to Mr. Ille describe the nature of his duties as Compliance Officer with respect to the NCAA and Big Ten rules, and what is involved in performing those duties (e.g., numerous requests for opinions on a daily basis and over 500 pages of NCAA rules, often differing in content based on the gender of the athlete and the particular sport involved), it is clear that he has one of the most demanding jobs that any University employee could have.

## V. DISCUSSION

 A temporary restraining order ("TRO") is an emergency remedy issued to maintain the status quo until a hearing can be held on an application for a preliminary injunction. *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*, 719 F.Supp. 725, 726 (N.D.Ill. 1989). The purpose of a TRO, similar to that of a preliminary injunction, is to minimize the hardship to the parties pending the ultimate resolution of the suit. *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir.1988). In this circuit, the standards

for a TRO and a preliminary injunction are functionally identical. *Bernina of America, Inc. v. Fashion Fabrics International,* 2001 WL 128164, at * 1 (N.D.Ill. Feb.9, 2001).

■ Injunctive relief, including the entry of a TRO, is warranted if the movant can make a threshold showing: (1) that the movant has some likelihood of success on the merits of the underlying litigation; (2) that no adequate remedy at law exists; and (3) that the movant will suffer irreparable harm if the injunction is not granted. If these three conditions are met, then the Court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently and consider the interest of the public in whether the injunction is to be granted or denied. *See Duct–O–Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 509 (7th Cir.1994); *Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 314–15 (7th Cir. 1994); *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir.1992).

For purposes of addressing the request for a temporary restraining order, the Court will recognize both of the class definitions as proposed by the Plaintiffs in their pleadings. (*See* Federal Rule of Civil Procedure 23b.)

### A. *LIKELIHOOD OF SUCCESS*

The Preclearance Directive has been attacked as: (1) a prior restraint on speech; (2) overbroad; (3) tainted by the presence of unfettered discretion; and (4) an impediment to anonymous speech. Each of these arguments will be addressed in turn.

#### 1. *PRIOR RESTRAINT*

a. Putative Student Class

■ The Preclearance Directive bans all speech directed toward prospective student athletes without prior permission from the Director of Athletics or his designee. While the ban might at first blush

appear to be content neutral as it purports to apply to all speech, the fact that the directive applies only to the audience of prospective student athletes and has subsequently been clarified by Mr. Ille to apply to at least two classes of purely content-based speech, that being (1) speech for the purpose of addressing any issue related to athletics and (2) speech for the purpose of addressing the prospective student's possible participation in intercollegiate athletics, seems to indicate that the ban is in fact a content-based prior restraint, as it unquestionably imposes a substantial burden on a particular type of expressive activity.

■ It is well-established that "any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *CBS v. Davis,* 510 U.S. 1315, 114 S.Ct. 912, 914, 127 L.Ed.2d 358 (1994). While the presumption against prior restraints "is by no means absolute, the gagging of publication has been considered acceptable only in 'exceptional cases.'" *Id., citing Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931). As the Supreme Court recognized in *Davis:*

> Even where questions of allegedly urgent national security, or competing constitutional interests, are concerned, we have imposed this "most extraordinary remed[y]" only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures.

114 S.Ct. at 914.

Here, the Preclearance Directive on its face bans speech that cannot be classified as "recruitment" under the plain language of NCAA Bylaw 13.02.11, which defines recruiting as:

> [A]ny solicitation of a prospect or a prospect's relatives or legal guardian(s) by an institutional staff member or by a

representative of the institution's athletics interests *for the purpose of securing the prospect's enrollment and ultimate participation in the institution's inter-collegiate athletics program.*

(emphasis added). The Preclearance Directive also bans speech by students who are neither employed by nor acting at the behest of either the University or the Department of Athletics and who do not meet the definition of a "representative of the University's athletic interests" as defined in NCAA Bylaw 13.02.12.

A "representative of the institution's athletics interests" is an individual, independent agency, corporate entity (e.g., apparel or equipment manufacturer) or other organization who is known (or who should have been known) by a member of the institution's executive or athletics administration to: (a) Have participated in or to be a member or an agency or organization promoting the institution's inter-collegiate athletics program; (b) Have made financial contributions to the athletics department or to an athletics booster organization of that institution; (c) Be assisting or to have been requested (by the athletics department staff) to assist in the recruitment of prospects; (d) Be assisting or to have assisted in providing benefits to enrolled student-athletes or their families; or (e) Have been involved otherwise in promoting the institution's athletics program.

NCAA Bylaw 13.02.12. The sole justification for this restraint of students' conduct is that the purchase of season tickets by students "may" qualify them as an athletic representative of the University for purposes of the NCAA rules, which the Court finds unpersuasive. The named Plaintiff students specifically aver that none of them is or has been a season ticket holder.

The University's justification for the application of the Preclearance Directive to these students strains the spirit and con-text of the applicable NCAA rules beyond the breaking point, particularly as the prohibitions are couched in terms of regulating the fairness of *recruitment* by individuals acting on behalf of the University and/or its athletics program, and the only express reference to a prohibition on contacts made by students not affiliated with the Department of Athletics merely prohibits contacts by such students "at the direction of a coaching staff member" or contacts which are "financed by the institution or a representative of its athletics interests." NCAA Bylaw 13.1.3.5.2.

Moreover, even the written opinion from Delise O'Meally ("Ms.O'Meally"), Membership Services Coordinator at the NCAA, upon which the Defendant relies for the proposition that the NCAA rules govern the situation presented in this case and are binding on the University, does not support the application of the Preclearance Directive to students who do not represent the athletic interest of the University and who do not intend to recruit prospective student athletes. (Defendant's TRO Exhibit 4.) To the contrary, while Mr. Ille's initial email to Ms. O'Meally expressly included six hypothetical situations involving contacts by faculty, staff, or students at the University, Ms. O'Meally's response referred only to contacts by an "institution" or an "institutional staff member." This omission indicates that Ms. O'Meally was not adopting the portion of Mr. Ille's hypotheticals that related to contacts by students who do not otherwise meet the definitions under the NCAA Bylaws.

After careful consideration of the evidence presented thus far, the Court finds that the record before it does not present the type of "exceptional" circumstances or a situation presenting a great and certain evil that cannot be militated by less intrusive means under which prior restraints have previously been upheld. There has

been no evidence of any situation in which similarly situated students have caused harm to the University's interests by contacting prospective student athletes to provide information on matters of public concern that bear only the most tangential relationship to the athletics program, or for that matter that the University has any concrete basis to presume that such communications would actually result in the feared harm in light of the Court's earlier findings with respect to the applicability of the NCAA Bylaws to this category of Plaintiffs. With respect to the putative student class, the measures taken by the University plainly go beyond a narrowly-tailored attempt to further a legitimate interest (compliance with the NCAA rules and regulations and the University's interest in protecting high school students from "undue pressure") and result in a prohibition and chilling of protected speech that cannot stand.

b. Putative Faculty Member Class

▮ It is also established that individuals do not forfeit their First Amendment rights merely by virtue of the fact that they accept employment with a governmental unit or agency. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). However, it is equally well-settled that the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. NTEU*, 513 U.S. 454, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995). In evaluating the constitutional propriety of a restraint on government employee speech, courts must attempt to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs

through its employees." *Pickering,* 88 S.Ct. at 1734–35.

▮ Here, the University argues that the Preclearance Directive is a content-neutral time, place, and manner restriction, which generally passes constitutional muster so long as it: "(1) [is] justified without reference to the content of the regulated speech; (2)[is] narrowly tailored to serve a significant governmental interest; and (3) leave[s] open ample alternative channels for communication of the information." *DiMa Corp. v. Town of Hallie,* 185 F.3d 823, 828 (7th Cir.1999). Here, it cannot be disputed that multiple alternative channels of communication (e.g., news conferences, letters to the editor, etc.) are and have always been available to Plaintiffs. However, Plaintiffs contend that the Preclearance Directive is really a content-based prior restraint to which the higher standard set forth in *NTEU* applies. Where a ban "chills potential speech before it happens ... the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU,* 115 S.Ct. at 1014.

Again, the Preclearance Directive bans all speech directed toward prospective student athletes without prior permission from the Director of Athletics or his designee and has been clarified by Mr. Ille to apply to two classes of purely content-based speech, indicating that the ban imposes a significant burden on a particular type of expressive activity and is at least to some degree in other respects content-based. *See id.* It also seems clear that the directive "chills potential speech instead of merely punishing actual speech

already communicated" and imposes a "blanket policy designed to restrict expression by a large number of potential speakers." *Milwaukee Police Assn. v. Jones,* 192 F.3d 742, 750 (7th Cir.1999); *Harman v. City of New York,* 140 F.3d 111, 118 (2nd Cir.1998). Thus, it would appear to operate as a prior restraint with respect to the putative faculty class, even under the Seventh Circuit's most recent pronouncements in *MacDonald v. City of Chicago,* 243 F.3d 1021, 1030–32 (7th Cir.2001), and *Thomas v. Chicago Park District,* 227 F.3d 921 (7th Cir.2000), as the directive on its face reduces a certain type of speech, vests considerable discretion with the Director of Athletics or his designee as the reviewing body by authorizing judgment about the content of any proposed speech or other expressive activity directed toward student athletes, places no time constraints upon the review process that prevent the proposed commentary from becoming moot by delay, refers to no appeals process, and presents the likelihood of self-censorship by eliminating the possibility of anonymous speech that may discourage potential speakers from coming forward. Thus, under the guidance of *Milwaukee Police Assn.* and *Harman,* the higher *NTEU* standard would seem to be applicable to the present situation.

It is undisputed that the Chief Illiniwek controversy presents a matter of public concern and that the members of the putative faculty class, as citizens, have an interest in being able to communicate on the topic. What remains, then, is the question of whether the University's stated interests are significant enough to outweigh the free speech interests of these Plaintiffs.

The University's asserted interest is in complying with its obligations as part of the NCAA, including rules regulating recruitment contact with prospective student athletes, as well as in protecting the educational and privacy interests of prospec-

tive student athletes. This is again based on the University's perception that the proposed communications with student athletes by faculty members would run afoul of the NCAA regulations, which is in part based on the written opinion from Ms. O'Meally indicating:

> [I]f an institution either identifies and contacts a group of prospective students based on their athletics ability or contacts prospective students to discuss their athletics participation those contacts are subject to NCAA regulations. Therefore ... if an institutional staff member makes a telephone contact, an in-person off-campus contact or sends written correspondence to a prospective student to discuss his or her athletics ability or possible participation in intercollegiate athletics such contacts would be considered recruiting contacts and would be subject to NCAA regulations. Further, if an institutional staff member makes a telephone contact, an in-person contact or sends written correspondence to prospective students who have been identified based on their athletics ability such contacts would also be considered recruiting contacts regardless of the content of the message and thus would also be subject to NCAA regulations.

(Defendant's TRO Exhibit 4.) Ms. O'Meally's Affidavit (Exhibit 4 to Defendant's Objection to Plaintiffs' Motion for Injunctive Relief), upon which Defendant also relies, states:

> In my experience, most contacts between member institutions and prospective student athletes are designed to recruit or induce the student athlete to attend the particular member institution, but the NCAA rules and regulations are not limited to contacts that can be demonstrated to be designed to induce attendance. As indicated above, the rules and regulations are designed in

part to shield student athletes from undue pressures, regardless of the source. See Manual at 2.11. While it is of course unusual that member staff or faculty would seek to discourage student athletes from attending their own institution, the NCAA contact rules and regulations referenced above have equal application to such a situation, and under the principle of Institutional Control and Responsibility, the member institution is responsible for compliance by all its staff.

NCAA Bylaw 13.01.5 states: "Representatives of an institution's athletics interests (as defined in Bylaw 13.02.12) are prohibited from making in-person, on- or off-campus recruiting contacts, or written or telephonic communications with a prospect or the prospect's relatives or legal guardians." A representative of athletic interests is defined as previously set forth in this Order in NCAA Bylaw 13.02.12. Recruiting is further defined as "any solicitation of a prospect or a prospect's relatives [or legal guardian(s) ] by an institutional staff member or by a representative of the institution's athletics interests for the purpose of securing the prospect's enrollment and ultimate participation in the institution's inter-collegiate athletics program." NCAA Bylaw 13.012.11.

The plain language and content of these rules and regulations are focused on regulating the conduct of those individuals who are acting on behalf of the University's athletic interests with respect to matters related to the recruitment of student-athletes, which parenthetically is defined under the regulations as "a student who has started classes for the ninth grade." NCAA Bylaw 13.02.10. They do not directly, or by reasonable inference, address the present situation, where a matter of public concern (racial stereotyping or insensitivity) is only tangentially related to athletics. In fact, it is clear to the Court, based on the record before it, that the NCAA rules and regulations never anticipated application of those rules and regulations to the present type of controversy. The Court questions whether the plain language of the NCAA Bylaws as written even apply in this case, as it has not been sufficiently established that the putative faculty class qualifies as "representatives" of the University's athletic interests or that the nature of the proposed contacts could in any reasonable way be deemed "recruiting."

While Mr. Ille testified that Ms. O'Meally's written opinion on the application of the rules to his six hypothetical situations would have the binding effect of a written bylaw, the Court has not been presented with or referred to any written rule indicating that this is the case. The testimony was that that conclusion results from discussions at various NCAA conferences and the fact that last year a proposed rules change providing that such written opinions are not binding was not approved. Furthermore, Ms. O'Meally was not presented in writing with the specific factual situation at issue in this case and did not appear to base her written opinion on the question of whether speech on the issue of the purported racial insensitivity and stereotyping posed by the use of Chief Illiniwek would run afoul of the NCAA Bylaws. Under the specific definitions contained in the relied-upon sections of the Bylaws, the Court also questions whether any interpretation finding such provisions directly applicable to the set of facts before it could be deemed objectively reasonable.

Nevertheless, even assuming that the NCAA Bylaws and written opinion apply to the present situation, the University's position ignores the question of whether an individual's First Amendment right to engage in expressive speech under these circumstances can be trumped by the Univer-

sity's reliance on the rules and regulations of a private organization, particularly where the spirit and the goals espoused by that organization have no substantial relationship to the nature of the expressive conduct being prohibited and the purported harm is largely speculative.

The proposed faculty class cites to *NTEU* and its progeny for this proposition, as that case noted that "where the government singles out expressive activity for special regulation to address anticipated harms, the government must 'demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'" *Harman,* 140 F.3d at 121. This point is well taken, as there has been no evidence of harm to date because all Plaintiffs have thus far complied with the Preclearance Directive, and the University has offered no evidence of so-called horror stories where similar acts of expression by similarly situated individuals have resulted in harm to the University or a detriment to its legitimate interests regarding its relationship with the NCAA. Nor does the University assert that it risks sanctions from the NCAA if this Court orders, as it is now doing, that the two defined classes of students and faculty cannot be restricted from engaging in their proposed contacts with prospective student athletes pursuant to the Directive's requirement that they obtain prior clearance to do so from Mr. Ille.

This Court is well aware of the important and necessary role that the NCAA plays in the regulation of intercollegiate sports. The Court is also aware that the University community would be substantially harmed if the NCAA found that, because of a rules violation, the athletics program at the University should be sanctioned. Nonetheless, the Court is concerned by the University's nearly total reliance on the NCAA Bylaws as justification

for its conduct in issuing the Preclearance Directive. The University cannot abdicate its independent responsibility to determine whether an NCAA rules interpretation is consistent with the First Amendment rights of its students and faculty and instead delegate that responsibility to the NCAA. The NCAA member duties that result from the University's voluntary decision to be a part of the NCAA cannot mean that the University has a right or obligation to check the First Amendment rights of its students and faculty at the door to the campus. In the context of this case, the University cannot establish a checkpoint through which everyone wanting to contact any high school student in the ninth grade or above must receive prior approval even if the matter is of public concern and not related to recruitment; it would seem to the Court that the NCAA could not reasonably expect any member institution to go so far as to unconstitutionally chill the speech of students and faculty on such topics.

### 2. *OVERBREADTH*

 Plaintiffs also argue that the Preclearance Directive as written is fatally overbroad, as it applies to all students/faculty/university employees without regard to the fact that the nature of their purported message is unrelated to athletic recruiting as defined in the NCAA rules. The Court agrees.

The regulation is unlimited with respect to time and place, and it clearly implies a threatened punishment for violation, although the precise nature of the sanction is unspecified. According to the testimony of Chancellor Aiken and Mr. Ille, the University must sometimes act proactively to prevent clear violations of the NCAA Bylaws which it has reason to anticipate. An appropriate and narrowly-tailored example of such proactive action is illustrated by

the University's distribution of the pamphlet entitled "An NCAA Rules and Regulations Guide," which it routinely distributes to boosters and other supporters of the athletic program, as well as others who could meet the definition of a "representative" of the University's athletics interests under the NCAA Bylaws. This pamphlet provides the information necessary to alert these individuals as to what conduct on their part may cause the University to be noncompliant with its obligations to the NCAA. The brochure then leaves it up to these individuals to exercise good judgment and act accordingly. The same simply cannot be said for the broad preemptive ban on speech that was imposed by the Preclearance Directive, which fails to limit itself to restricting no more speech than is reasonably necessary to protect the University's interests, as it unnecessarily reaches a substantial amount of constitutionally protected conduct. *See City of Houston, Texas v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987); *Weaver v. U.S. Information Agency,* 87 F.3d 1429, 1440 (D.C.Cir.1996).

### 3. *TOO MUCH DISCRETION*

Plaintiffs also argue that the Preclearance Directive vests the designated "censor" with too much discretion, as the Director of Athletics or his designee is left to definitively decide who can and cannot speak to prospective student athletes. While the University takes the position that the discretion is limited by the NCAA Bylaws and that the directive only applies in the four previously identified situations, both the Bylaws and the four situations are subject to a considerable amount of subjective interpretation and judgment, as is painfully demonstrated by the record of this case.

One could also argue that the process does not in practice provide *enough* discretion, since the record clearly reflects the belief of Chancellor Aiken and Mr. Ille

that the NCAA rules and the interpretations of these rules by NCAA personnel effectively determine the outcome of any inquiry as to whether the speech should be allowed.

### 4. *ANONYMOUS SPEECH*

■ Finally, Plaintiffs argue that the nature of the directive eliminates the possibility for anonymous speech, as individuals who are forced to identify both themselves and the precise nature of their message to Mr. Ille in the course of obtaining permission to speak are likely to be chilled and refrain from such communications for fear of retaliation by University administration or others. While the University dismisses this argument and the case upon which Plaintiffs rely, *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), as applicable only in the context of "political speech," the Court does not agree that the interest in protecting anonymous speech is so limited. The *McIntyre* case expressly noted the availability of protection for anonymous speech in the literary realm, as well as the distribution of handbills urging the boycott of merchants allegedly engaging in discriminatory employment practices. *Id.* at 1516–17. "[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.* at 1516. The Court also rejects the assertion that the type of speech at issue here is not "political speech."

### B. *IRREPARABLE HARM*

■ The United States Supreme Court has held, "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S.

347, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976), *citing New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Plaintiffs state that they have refrained from any attempts to communicate with student athletes on matters of public concern in the wake of the Chancellor's Preclearance Directive and Mr. Ille's clarification of that directive. Thus, the Court finds that Plaintiffs' ability to satisfy the second prerequisite for injunctive relief has been established.

## C. *NO ADEQUATE REMEDY AT LAW*

In using the term "inadequate", the Seventh Circuit has stated, "we do not mean wholly ineffectual; we mean seriously deficient as a remedy for the harm suffered." *Cooper v. Salazar*, 196 F.3d 809, 817 (7th Cir.1999), *citing Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir.1984). Here, Plaintiffs do not seek money damages in any form, and it is not readily apparent how money damages would be determined to compensate them for the deprivation of the ability to timely present information that arguably enables prospective students to make an informed and knowing decision regarding the academic institution they will attend. Accordingly, this aspect of the inquiry has also been satisfied.

## D. *BALANCING OF THE HARMS*

█ When the Court weighs the interests of the parties and the public interest in whether the injunction is to be granted or denied, it "seek[s] at all times to minimize the costs of being mistaken." *Abbott Laboratories*, 971 F.2d at 12 (internal quotation marks omitted). Thus, "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Id.*

Balancing the hardships therefore involves a two-step process. First, the Court must assess the movant's chance of success. This inquiry is similar to the likelihood of success factor considered at the threshold stage. In making the threshold inquiry, however, the movant must only show some likelihood of success on the merits. *Roland Machinery*, 749 F.2d at 387. At the balancing stage, the Court must determine how great that likelihood is. Then it must balance the hardships in accordance with this determination.

Here, as discussed above, Plaintiffs have demonstrated a substantial likelihood that they will ultimately prevail on the merits of their claims and have also demonstrated that they have been chilled from exercising their right to freedom of expression on a matter of public concern and interest since the issuance of the Preclearance Directive. By virtue of this chilling effect, one could also find that prospective students have been harmed by the inability of these Plaintiffs to communicate information relevant to their ability to make an informed decision about where to obtain their postsecondary education.

By contrast, the University has not shown the same degree of harm with respect to its ability to satisfy its legitimate interests in complying with the NCAA Bylaws and protecting the educational and privacy interests of prospective student athletes. There has been no showing that prospective students either have been or will likely be disrupted in their educational pursuits or subjected to undue pressure by virtue of the limited contact proposed in this case. Nor has there been any showing that the NCAA would find that the University had not met its obligations in exercising institutional control under the facts of this case and impose penalties; again, the Court finds it inconceivable that

the NCAA could ultimately reasonably and justifiably expect any member institution to go so far as banning protected speech by its students and faculty on matters not directly related to recruitment and only tangentially related to the intercollegiate athletics program. Moreover, in light of the substantial overbreadth of the Preclearance Directive and absence of objective criteria limiting the potential for the abuse of discretion, the Court finds that it would not greatly harm the University to hold the enforcement of the Preclearance Directive as it pertains to the two Plaintiff classes temporarily in abeyance until a full hearing on whether preliminary injunctive relief should issue.

Thus, the Court finds that the balance of the harms tips in Plaintiffs' favor for purposes of resolving the present motion.

### E. *PUBLIC INTEREST*

In determining whether to grant preliminary injunctive relief, the Court must consider the impact on the public interest if such relief is granted. *Abbott Laboratories,* 971 F.2d at 11–12; *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 909 (7th Cir.1986). This circuit has recognized that the public has a strong interest in the vindication of an individual's constitutional rights, particularly "in encouraging the free flow of information and ideas" under the First Amendment. *O'Brien v. Town of Caledonia,* 748 F.2d 403, 408 (7th Cir. 1984).

### VI. CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs have satisfied the elements necessary for the issuance of a Temporary Restraining Order. Accordingly, the Court finds that Plaintiffs' Motion for Temporary Restraining Order [# 4] shall be GRANTED in that Defendant and his designees are hereby enjoined from enforcing the portion of the Preclearance Directive requiring the pre-

clearance of communications with prospective student athletes: (1) by University students who do not represent the athletic interests of the University and who do not intend and will not recruit prospective student athletes; and (2) on matters of public concern by University faculty who do not represent the athletic interests of the University and who do not intend and will not recruit prospective student athletes. Under the circumstances presented by this case, the Court finds that no bond is required. This Injunction Order will remain in effect until the Preliminary Injunction hearing, the date and time of which will be determined after consultation with counsel during a telephonic hearing to take place at 3:00 p.m. this afternoon, or until some intervening Order of the Court.