CHURCH OF THE AMERICAN
KNIGHTS OF THE KU KLUX
KLAN, Plaintiff,

v.

CITY OF GARY, INDIANA, Defendant.

No. 201–cv–062.

United States District Court,
N.D. Indiana,
Hammond Division.

Sept. 4, 2002.

Kenneth J. Falk, Indiana Civil Liberties
Union, Indianapolis, IN, for plaintiff.

Lukas I. Cohen, James B. Meyer, Rebecca L. Wyatt, Meyer & Wyatt, PC, Gary, IN, for defendant.

### ORDER

MOODY, District Judge.

The court *sua sponte* questioned the existence of a "case" or "controversy" in this dispute. After consideration of the parties' memoranda on the subject, as well as factual submissions in the form of affidavits, the court concludes, as more fully detailed below, this matter is not justiciable and accordingly **DISMISSES FOR WANT OF JURISDICTION.**

### I. BACKGROUND

The Church of the American Knights of the Ku Klux Klan ("CAKKKK") commenced this action on January 26, 2001, by depositing its pleading with the Clerk. In its Complaint, CAKKKK stated a claim pursuant to section 1 of the Civil Rights Act of April 20, 1871, ch. 22, 17 Stat. 13 (codified as amended at 42 U.S.C. § 1983), in which the Reconstruction-era Congress provided a federal cause-of-action for alleged constitutional infringements perpetrated under color of state law. CAKKKK alleged that a recently-signed Executive Order by Gary (Indiana) mayor, Scott King, was an action taken under the guise of state law which, if enforced, would impermissibly curtail CAKKKK's rights secured by the First Amendment. The Executive Order requires any group seeking to conduct a "parade and/or open air assembly" within the City to file a request for a permit no later than 45 days in advance.[1] As redress for what it perceived as a transgression of constitutional proportions, CAKKKK prayed for declaratory and injunctive relief. (*See* Compl. at 6.)

Concomitant with the filing of its Complaint, CAKKKK requested provisional remedies in the form of an injunction prohibiting both the operation of any City ordinance requiring 45–day notice in advance of a "parade and/or open air assembly;" and the enforcement of Mayor King's Executive Order. (*See* Mot. for Prelim. Inj'n at 2.) In addition, CAKKKK petitioned for a preliminary mandatory injunction to require the appropriate City authorities to issue a permit for a rally at City Hall on February 3, 2001. (*See id.*) The court ordered a response by no later than January 30, 2001. After reviewing the City's filings in opposition to provisional relief, the court set a hearing for February 1, 2001. At the hearing, the court received evidence from both sides and entertained argument. (*See* Dkt. Entry # 12 (minutes).) The court adjourned, having taken the motion under advisement. Later that day, the court issued a written order denying all provisional relief. (*See* Dkt. Entry # 11.)

Since the court denied the motion for a preliminary injunction, the 45–day waiting period remained in effect. As a result, CAKKKK conducted its rally at Gilroy Stadium in Gary on March 10, 2001. (King Dep. at 32.22–.25.) Approximately 27

---

1. The body of the Executive Order provides as follows:

   Effective January 18th, 2001 the City of Gary's administrative procedure regarding the issuance of parade and open air assembly permits is amended as follows:

   Applications for parade and/ or open air assembly permits shall be submitted in writing on the form prescribed by the City of Gary Department of Public Works to the Department of Public Works no later than forty five (45) days prior to the date requested in such application for parade and/ or open air assembly. Such applications shall be processed and approved or not approved by the Mayor no later than fifteen (15) days after receipt of said application by the Department of Public Works.

   (Compl. at Att. 4.)

members of CAKKKK attended the event. (*See id.* at 41.18–.19.) Noticeably absent from the affair was Jeffrey Berry, its self-described founder[2] and National Imperial Wizard.[3] By all accounts, with the exception of an incident involving someone not affiliated with CAKKKK, the demonstration came off without a hitch. (*See* Berry Supp.Aff. at ¶¶ 3–4; King Dep. at 41.23–42.04.)

On April 24, 2001, Magistrate Judge Rodovich granted CAKKKK leave to file an amended complaint. (*See* Dkt. Entry # 21.) In it, CAKKKK reiterates its contention that the 45–day notice requirement is impermissible. In addition, CAKKKK challenges a subsequent executive order (similarly named "EXECUTIVE ORDER NO. 01–02"), signed by Mayor King on April 3, 2001. (*See* Amd.Compl. at Att. 6.) This Executive Order allows the City to assess a fee upon an applicant for a "parade and/or open air assembly" permit, if the Chief of Police in an exercise of professional judgment determines that the applicant's constituent members pose a threat to the public order. (*See id.*) The amount of the fee is a function of the incremental cost necessary to ensure public safety. (*See id.* ("The cost shall be the actual cost to the City of Gary for those police officers that have been determined to be reasonably necessary to protect persons and property from harm by the Applicant.")) Upon completion of discovery, the parties submitted cross-motions for summary judgment. These motions were fully briefed by January 28, 2002.

During the briefing of the summary judgment motions, Berry "pleaded guilty to conspiracy to commit criminal confinement with a deadly weapon." *DeKalb Klan Leader Enters Guilty Plea,* FORT WAYNE NEWS-SENTINEL, Oct. 3, 2001, at 6A. He was sentenced to seven years imprisonment. *See Klan Leader Sentenced,* PITTSBURGH POST-GAZETTE, Dec. 5, 2001, at B–7. Records indicate he is currently serving his sentence in the high-medium security area of the Miami Correctional Facility. *See Offender Public Information Search, available at,* www.in.gov/indcorrection. May 28, 2005 marks his "earliest possible release date." *Id.* In a written order dated May 23, 2002, the court expressed its concern about the continued justiciability of this dispute, *see Kelly v. United States,* 29 F.3d 1107, 1113 (7th Cir.1994) ("[Federal courts] have an obligation ... to assure themselves of their own jurisdiction."), in light of the judicially-noticed facts mentioned in this paragraph, *see* Fed.R.Evid. 201(c) ("A court may take judicial notice, whether requested or not."). The parties submitted briefs on the justiciability issue, and CAKKKK also tendered an affidavit from Jean Null.

Null describes herself as "the Indiana Grand Dragon[ess]" of the CAKKKK. (*See* Null Aff. of May 29, 2002 at ¶ 1.) She indicates her group "has not conducted rallies in Indiana since Rev. Berry was incarcerated because [it] did not want to adversely affect any possible sentencing modification." (*Id.* at ¶ 11.) Yet, she concludes her affidavit with the following statement:

> However, I know that Rev. Berry feels very strongly about having a rally in Gary, Indiana. If the Court was to rule in our favor in the lawsuit, I would organize a rally in Gary at the earliest possible opportunity which the

---

2. "I ... started up Church of the American Knights of the Ku Klux Klan." (Pl.Mot. for Summ.J. at Att. 1 (Berry Dep. at 20.08–.10.).)

3. "I'm the national imperial wizard." (*Id.* at 13.20.)

[CAKKKK] would conduct even if Rev. Berry was still incarcerated. (*Id.* at ¶ 12.)

## II. LEGAL STANDARD

It is unquestioned reality that the federal courts were established with limited jurisdiction, THE FEDERALIST No. 80 (Alexander Hamilton), and this notion remains principally undisturbed. As such, an unflagging obligation exists upon each court to refrain from adjudicating matters outside the purview of its institutional authority. Justiciability is the term assigned to the concept that some disputes do not rise to the level of "Cases" as that word appears in Article III of the Constitution. The doctrine of mootness is a subset of non-justiciable matters, an acknowledgment that although a "case" perhaps existed at some time, events occurring during the pendency of the action may vitiate the adjudicatory vitality of the dispute. Non-justiciable matters are inappropriate for judicial deliberation or consideration. *See Iddir, et al. v. INS., et al.,* 301 F.3d 492, 502 (7th Cir.2002) (Flaum, C.J., concurring) ("[T]he 'case or controversy' requirement of Article III of the United States Constitution prohibits federal courts from deciding moot cases.").

Justiciability conforms to no mathematical or scientific formulation, and as this exposition implies, the precursor of determining if a dispute fails to meet justiciability norms is frequently more elusive than the articulation of its effect (which is simply dismissal for want of jurisdiction, *cf.* Fed.R.Civ.P. 12(b)(1)). Thus, an exploration of United States Supreme Court and other binding decisions will prove helpful in assessing the parameters of mootness as applicable here.

*DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) represents the genesis of contemporary mootness jurisprudence. The University of Washington Law School rejected Mr. DeFunis' application for admission. Dissatisfied with this outcome, he sued the University in state court, contending he was the victim of impermissible discrimination. The trial court found in his favor, and awarded equitable relief, ordering the University to place him in the School's *juris doctor* program. By the time the United States Supreme Court granted *certiorari,* DeFunis had commenced his final year of studies. During oral argument, the Court was informed that DeFunis had "registered for his final quarter in law school." 94 S.Ct. at 1705. The Court refused to descend to the merits of DeFunis' claim, holding as follows:

> Because the petitioner will complete his law school studies at the end of the term for which he has now registered regardless of any decision this Court might reach on the merits of this litigation, we conclude that the Court cannot, consistently with the limitations of Art. III of the Constitution, consider the substantive constitutional issues tendered by the parties.

*Id.* at 1707.

Four Justices dissented. Three primary themes surface from their writings. First, the dissenters take exception with the majority's view of the nature of mootness. They conceive of the doctrine as an absolute, requiring metaphysical certitude. For instance, they refer to "[a]ny number of unexpected events—illness, economic necessity, even academic failure—[that] might prevent his graduation at the end of the term." *Id.* at 1721 (Brennan, J., dissenting). The majority responded to the broader implication of this thesis by stating "such speculative contingencies" are insufficient to capture the dispute within the talons of Article III. *Id.* at 1704 n. 5 (per curiam) (quoting *Hall v. Beals,* 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214

(1969)). The more narrow point (and one frequently overlooked in the scholarly analysis of Justice Brennan's opinion) is whether the occurring of any of these "unexpected events" would have subjected DeFunis to the allegedly unconstitutional policies of which he complained. DeFunis' theory of the case rested solely on the "admission process" which was state action he believed taken in contravention to the Fourteenth Amendment. *See id.* at 1708–10 (Douglas, J., dissenting) (describing the "admissions process"). He made no challenge to University policies applicable to matriculating students, and presumably it would have been *those rules,* and not the ones governing prospective students that would have governed had DeFunis suffered an "unexpected event[]."

The dissent then shifted away from metaphysics and toward the adversarial process that forms a necessary foundation to all federal litigation. They posit that "this controversy falls squarely within the Court's long line of decisions holding that the '[m]ere voluntary cessation of allegedly illegal conduct does not moot a case.' " *Id.* at 1721 (Brennan, J., dissenting) (quoting *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). The University, however, never altered its criteria for determining which individuals it would accept into its *juris doctor* program, *except* when it complied with the state court order to admit DeFunis. Thus, its only deviation from administering the "allegedly illegal" admission policy came as the result of compulsion from a state court (behavior inconsistent with the ordinary meaning of "voluntary"). *See id.* at 1706 (per curiam) (explaining that voluntary cessation considerations "would be quite relevant if the question of mootness here had arisen by reason of a unilateral change in the *admission procedures* of the Law School" (emphasis in original)).

Finally, the dissenters chide the majority's order of dismissal as "clearly disserv[ing] the public interest." *Id.* at 1722 (Brennan, J., dissenting); *accord id.* at 1708 (Douglas, J., dissenting) (amplifying "the significance of the issues raised"). The majority saw it differently: because the jurisdictional limitations upon federal courts derive from constitutional mandate, *see* Art. III, § 2, subsidiary are concerns for resolving matters expeditiously.

More recent United States Supreme Court decisions have expressed fidelity to the three principles analyzed above: (1) mootness does not adhere to a state of metaphysical certainty, but rather flows from the probable course of events; (2) concerns that a party's "voluntary cessation" of behavior is limited to the "allegedly unlawful" conduct at issue in the litigation; and (3) courts must resist the temptation to overlook justiciability defects merely to adjudicate disputes at the forefront of public consciousness.

The question of mootness was brought to center-stage in *Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (*"AFOE"*). In 1988, Arizona voters approved a ballot measure, adding an amendment to the State Constitution that required the State (with limited exceptions) to "act in English and in no other language." 117 S.Ct. at 1060 (quoting Ariz. Const. amend. XXVIII, § 3(1)(a)). "On November 10, 1988, Maria Kelly–F. Yniguez, then an insurance claims manager in the Arizona Department of Administrator's Risk Management Division, sued the State of Arizona in the United States District for the District of Arizona." *Id.* She is bilingual, speaking English to colleagues and many persons with whom she dealt in her professional capacity, but she also spoke Spanish on the job to individuals who exhibited greater comfort with that language. She feared

Amendment XXVIII would cause her adverse employment consequences. She won in the District Court, the judgment for which the Arizona Attorney General and two interveners (AFOE and Robert D. Park) sought to appeal. On the day after they filed their notices of appeal, "a development of prime importance occurred." *Id.* 117 S.Ct. at 1065. Yniguez resigned her position in favor of private-sector employment.

The Court of Appeals for the Ninth Circuit nevertheless adjudicated the appeal. In a unanimous opinion, the United States Supreme Court stated, "[t]he Ninth Circuit had no warrant to proceed as it did." *Id.* at 1060. Rather, the justiciability of the dispute evaporated on the day Yniguez terminated her employ with the State. *See id.* at 1069 ("Yniguez left her state job in April 1990 to take up employment in the private sector, where her speech was not governed by Article XXVIII. At that point, it became plain that she lacked a still vital claim for prospective relief."). The critical fact was the action performed, tendering her resignation. *See id.* at 1071 ("Yniguez's changed circumstances—her resignation from public sector employment to pursue work in the private sector—mooted the case stated in her complaint."). Intent played no role in the mootness determination: the dispute did not lose its justiciable character when Yniguez intended to leave her job, nor retain it on the remote contingency that she may return to work for the State.

Like *AFOE*, Justice Ginsburg again wrote for an undivided Court in *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001). City News sought to renew its license to peddle sexually explicit materials, and applied to the City of Waukesha for the appropriate license. The City turned down the request, and City News sought redress in the courts. Just prior to oral argument in the United States Supreme Court, "City News gave notice that it would withdraw its renewal application and close its business." 121 S.Ct. at 746. In holding the case lost its justiciability, the Court noted "City News neither now pursues not currently expresses an intent to pursue a license under Waukesha law." *Id.* at 746–47. In an apparent attempt to qualify its intentions, City News insisted "it 'has never promised not to apply for a license' in the future." *Id.* at 747 (quoting City News' Reply Brief at 1.). The Court was unmoved by this statement of intention, indicating "speculation standing alone" does not rescue the lawsuit. *Id.* Most importantly, in *City News*, the Court reaffirmed reference to corporeal, observable events, not speculation and intention, to guide mootness analysis.

City News advanced an alternative argument based on *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), one of two United States Supreme Court opinions of recent vintage where the Court declined to hold a civil action moot. Pap's, an owner of a nude dancing establishment, sued the City to enjoin it from enforcing a newly-enacted ordinance banning public nudity. After the Pennsylvania Supreme Court sided with Pap's, the City's petition for a writ of *certiorari* was granted. Pap's subsequently filed a motion to dismiss the appeal because Pap's had sold the real property upon which the establishment was located, indeed the establishment now housed a comedy club. Moreover, Pap's was no longer in the nude dancing business whatsoever, and Pap's 72 year-old sole shareholder had indicated he broke off all contacts with the adult entertainment industry, 120 S.Ct. at 1398 (Scalia, J., concurring).

The act of ceasing to operate a nude dancing establishment in Erie would usual-

ly have sufficed to moot the litigation, but other considerations militated against such a conclusion. Had the Court dismissed for want of jurisdiction, the judgment of the Pennsylvania Supreme Court would have been left intact, saddling the City with an inability to enforce its nude dancing regulations. In addition, the Court expressed concern for the possibility that a holding of mootness would provide incentive to parties who win in lower courts to alter their conduct to such a degree as to make disputes appear moot, in an effort to thwart appellate jurisdiction and preserve a favorable judgment. *See id.* at 1390–91 ("Our interest in preventing litigants from attempting to manipulate the Court's jurisdiction to insulate a favorable decision from review further counsels against a finding of mootness here.").

Justice Scalia (with whom Justice Thomas joined) posited the action moot. First, he suggested the countervailing concerns for the integrity of appellate procedures should not receive fidelity paramount to justiciability. If one parses out this concern (notably unique to appellate courts and not shared by district courts) from the litigation, it appears both the majority and the concurrence would agree the action was moot. Even including the issue of appellate integrity, the majority described the call as "close." *Id.* at 1391. Second, Justice Scalia takes exception to the majority's conjecture that Pap's "could resume its dancing operations in the future." *Id.* at 1398. Instead, he appears to focus upon tangible events (sale of the real property upon which the establishment was located), and observable realities (Pap's sole shareholder is 72 years-old and the corporation operates no active business). In Justice Scalia's view, the fact Pap's continued to exist as a matter of Pennsylvania corporate law and the metaphysical possibility that fact created (that it could re-enter the nude dancing business) was

insufficient to support the continued justiciability of the dispute.

Finally, in *Friends of the Earth v. Laidlaw Environ. Servs.*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), the Court held the case was not moot even though Laidlaw had ceased all operations at the facility that was allegedly producing pollution in contravention of the Clean Water Act. 120 S.Ct. at 703 ("[T]he entire incinerator facility in Roebuck was permanently closed, dismantled, and put up for sale, and all discharges from the facility permanently ceased."). The Court concluded "[t]he only conceivable basis for a finding of mootness in this case is Laidlaw's voluntary conduct." *Id.* at 708. Since a long line of decisions makes clear that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," *e.g., City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), the Court proceeded to the merits of the claim.

From these decisions, the court can extrapolate several important principles. When determining whether a dispute can retain its justiciable character, the court must identify and utilize a probable course of events, not one based on speculative contingencies. *See DeFunis,* 94 S.Ct. at 1704. Justiciability concerns receive no less rigorous consideration when the parties are litigating the constitutionality of governmental action, and thereby call upon the federal judiciary to invoke its powers of judicial review, *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) (establishing judicial review of federal legislation). In conducting an inquiry into whether a dispute qualifies for judicial review, reference to tangible events is paramount. *See City News,* 121 S.Ct. at 747; *AFOE,* 117 S.Ct. at 1071.

## III. DISCUSSION

■ CAKKKK has the burden of satisfying the court that the dispute remains justiciable. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). CAKKKK attempts to carry its burden by offering two theories. First, it contends the record contains facts sufficient for the court to find an ongoing, live controversy. (*See* Pl.Mem. filed May 31, 2002, at 3.) Second, it asserts, notwithstanding the record, this action is not moot because it falls within the "capable of repetition" category of litigation.

### A.

In addition to the materials filed in the summary judgment motions, CAKKKK supports its position by adding the affidavit of Jean Null to the record. She indicates in the aftermath of Berry's legal woes, CAKKKK remains an active organization, with 10–12 membership inquiries arriving in the mail each week. (*See* Null Aff. ¶ 10.) Their website remains operational and CAKKKK members regularly gather to conduct official business. (*See id.* at ¶¶ 9–10.) This tangible evidence suggests CAKKKK remains an ongoing concern, but what is their capability of mounting a march in Gary, Indiana?

■ In support of the position that CAKKKK stands at the ready to conduct a march in Gary, Null states the following: "I know that Rev. Berry feels very strongly about having a rally in Gary, Indiana." (*Id.* at ¶ 12.) Does this quoted language meet the admissibility requirements the Federal Rules of Evidence imposes? Rev. Berry's strong feeling is apparently offered as an indication of his solidarity with CAKKKK's attempt to march in Gary (and his support presumably makes more likely CAKKKK's prospects of actually conducting the rally, which in turn makes mootness less probable). The truth of Berry's statement (assuming he ever made a statement about feeling very strongly) constitutes hearsay. *See* Fed.R.Evid. 801(a) & (c). The only conceivable exception is Fed.R.Evid. 803(3) which provides in pertinent part: "A statement of the declarant's *then existing state of mind,* emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" (emphasis added). Null's statement attempts to tell the court Berry's state of mind at the time she produced the affidavit. (Note that Null uses the present tense: "Rev. Berry feels very strongly.") Yet, it is exceedingly unlikely Berry was conveying his state of mind to Null at the moment she was creating her affidavit. Thus, Null's statement is inherently unreliable. Fed.R.Evid. 803(3), like its distant cousin, Fed.R.Evid. 803(1) (Present Sense Impression) requires a statement detailing the state of things at a particular point in time. *See* Fed.R.Evid. 803 advisory committee's note ("Paragraph (3) is essentially a specialized application of Paragraph (1), presented separately to enhance its usefulness." (alterations omitted)). The delineating between the two exceptions makes good sense. In short, Berry's state of mind, to the extent it is relevant here, can not be proven in the manner offered, and thus this portion of Null's declaration is inadmissible to demonstrate the requisite probability that CAKKKK can march in Gary, Indiana.

■ Null also avers that if the court enjoins Gary from enforcing the two challenged executive orders, she "would organize a rally in Gary at the earliest possible opportunity which the CAKKK[K] would conduct even if Rev. Berry was still incarcerated." (Null Aff. at ¶ 12.) There are two problems with this statement.

First, although admissible under the Fed.R.Evid., it is difficult to give the statement substantial weight because the tangi-

ble evidence is inconsistent with it. In an affidavit signed in early September 2001, Berry indicated CAKKKK "ha[d] conducted approximately 100 rallies or other appearances in Indiana in the past five years." (Supp.Aff. of Jeffrey Berry at ¶ 2.) Yet, in the last 12 months, a period of time roughly coinciding with the date of Berry's conviction, CAKKKK "has not conducted rallies in Indiana." (Null Aff. at ¶ 11.) Null attributes this cessation of marches to the CAKKKK's desire to assist Berry in securing the most favorable sentence possible. (*See id.* ("[W]e did not want to adversely affect any possible sentencing modification.").) Berry, however, was sentenced and remanded to custody on December 3, 2001. (*See generally* Def's. Reply filed June 7, 2002, at Att. 2 (Transcript of Jeffrey Berry's Sentencing Hrg.).) In the ten months that have elapsed, CAKKKK has not resumed marching activities to levels enjoyed prior to Berry's troubles. This observation is consistent with the theory that Berry was a galvanizing force for CAKKKK and integral to its marching prowess. Once he disavowed active involvement in the organization, (*see* Transcript of Jeffrey Berry's Sentencing Hrg. at 71.03–.04 ("I've not been involved in Klan activities since this or anything else, Sir.")), marching in Indiana permanently and unilaterally ceased. Thus, notwithstanding Null's optimism to the contrary, the corporeal evidence indicates this action is moot.

■ Second, even if the court completely credited Null's statement to the effect that she intends to organize a rally on Gary if CAKKKK wins this lawsuit, that fact alone would not suffice to sustain justiciability. According to numerous United States Supreme Court decisions, the fact of a plaintiff's intent to engage in particular behavior is insufficient without supporting tangible evidence to overcome mootness. *See, e.g., City News,* 121 S.Ct. at 747 (rejecting "speculation standing alone").

As previously mentioned, the tangible evidence, particularly (but not limited to) the precipitous drop in marching activity coincident with the commencement of Berry's criminal case and subsequent incarceration, suggests it is not sufficiently probable Null's intention will come to fruition.

**B.**

CAKKKK also urges that the action is not moot because it is capable of repetition yet will evade review. (*See* Pl's. Mem. filed May 31, 2002, at 3.) This doctrine is occasionally presented as an exception to mootness, but it is perhaps more satisfying to view "capable of repetition" as a description of the *continuing existence* of a justiciable controversy.

■ No matter how one conceptualizes it, "the capable-of-repetition doctrine applies only in exceptional situations," *Lyons,* 461 U.S. at 109, 103 S.Ct. 1660, such as "when (1) the challenged action is too short in duration to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Tobin for Governor v. Ill. State Bd. of Elect.,* 268 F.3d 517, 529 (7th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1300, 152 L.Ed.2d 212 (2002); *accord Spencer v. Kemna,* 523 U.S. 1, 118 S.Ct. 978, 988, 140 L.Ed.2d 43 (1998). In this case, certain remedial devices, such as a temporary restraining order or preliminary injunction remain available to CAKKKK if it attempts to conduct a future march in Gary. In particular, the procedures governing temporary restraining orders invite district courts to review matters most expeditiously. *See* Fed.R.Civ.P. 65(b); *and* N.D.Ind.L.R 65.1. First Amendment disputes are frequently the subject of temporary restraining orders. *See, e.g., Weinberg v. City of Chicago,* 179 F.Supp.2d 869, 871 (N.D.Ill.2002) (granting

temporary restraining order against the City); *Crue v. Aiken,* 137 F.Supp.2d 1076, 1078 (C.D.Ill.2001) (granting temporary restraining order prohibiting University of Illinois "from requiring the preclearance of communications"). Moreover, the applicable procedural rules allow the district court to conduct a trial, if necessary, coincident with a preliminary injunction hearing. *See* Fed.R.Civ.P. 65(a)(2). In short, these avenues of prompt redress make the "evading review" portion of the equation fail. Moreover, the court is not confronted with a situation that is "capable of repetition." As the court previously mentioned, *see supra* Part III.A, from all appearances, Berry's legal woes brought CAKKKK's marching activities in Indiana to an abrupt halt. This is no mere coincidence. He had been a motivating force for the organization, but subsequently disavowed his association to the group's activities. Thus, it is unlikely the executive orders at issue here will directly interfere with future CAKKKK operations.

## IV. CONCLUSION

The tangible evidence leads the court to conclude this action is moot, and therefore no longer qualifies for judicial review[4] within the federal courts. This action is hereby **DISMISSED FOR WANT OF JURISDICTION.** Pending motions are **DENIED AS MOOT.**

The court **DIRECTS** the Clerk to record a final judgment accordingly.

**SO ORDERED.**

---

4. Thus, nothing in this Order should be construed as an expression by the court of an opinion on the merits of CAKKKK's claims.